**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STEVEN D. WILLIS**
**LA. DOC #563328**

**VS.**

**WARDEN NATHAN CAIN**

**CIVIL ACTION NO. 3:13-cv-2557**

**SECTION P**

**JUDGE ROBERT G. JAMES**

**MAGISTRATE JUDGE HAYES**

**REPORT AND RECOMMENDATION**

*Pro se* Petitioner Steven D. Willis, an inmate in the custody of Louisiana's Department of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on August 27, 2013. [doc. # 1]. Petitioner attacks his 2010 convictions for two counts of armed robbery and the two concurrent forty-two-year sentences imposed by the Fourth Judicial District Court, Ouachita Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

**Background**

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal as follows:

> James Jackson makes his living by selling various items of merchandise such as shoes, purses and clothing out of an SUV. On March 8, 2009, Jackson and his girlfriend, Makema Epting, as well as six minor children, drove in Epting's Chevrolet Suburban to a location in Monroe known as South Park Circle in response to a phone call Jackson received from a prospective buyer. The unidentified caller, later determined to be the defendant, allegedly wanted to purchase some shoes from Jackson.
>
> Upon arrival at South Park, a man later identified as Jacques Simmons approached the vehicle. Jackson opened the back of the Suburban to show him some shoes. While Simmons distracted Jackson, a masked and armed individual approached. This

person cursed and threatened Jackson with a handgun, and later placed the gun to the head of one of the children. Jackson begged for the children, gave the defendant his wallet, and told Willis that he could have everything. The defendant ultimately forced everyone out of the vehicle. Other perpetrators flocked to the SUV to remove merchandise. The defendant then drove off in the vehicle leaving the adult victims and children on the street.

Over the course of the investigation following the robbery, police officers learned that Steven Willis was the masked gunman. Jacques Simmons, the person who approached the vehicle under the guise of buying shoes, admitted his involvement in the crime and stated that Willis was the gunman.

Jackson testified at trial that after receiving the telephone call on March 8, 2009, from someone wanting to buy some shoes, he and Makema Epting and six children drove to South Park Subdivision in Epting's 1995 Suburban. There, Jackson met Jacques Simmons and showed Simmons the merchandise he had available for sale from the back of the vehicle. Simmons did not have a gun nor at any time did Simmons point a gun at Jackson. While showing Simmons a pair of shoes, Jackson glimpsed a man wearing a red mask. The masked man put a gun to Jackson's head and began shouting expletives. The armed perpetrator, later identified as Steven Willis, told Jackson he wanted "everything." Jackson gave the defendant his wallet.

Willis also threatened one of the children, putting the gun on Jackson's two-year-old child and telling Jackson, "[l]ay down on the ground or I'm going to blow this little mother f***er's head off." At this point, other perpetrators came upon the vehicle and started grabbing boxes out of the back of the SUV. The defendant then put the gun on Makema Epting and the kids started jumping out of the vehicle. All eight occupants made it out of the Suburban before Willis drove off in the SUV. Jackson testified that they were all "shook up" and the whole incident was a "nightmare." He counted the kids to make sure that they were all accounted for, and then he called the police. The SUV was recovered later that night and Jackson testified that it was trashed and all his merchandise had been taken.

Makema Epting also testified for the state. Although her testimony concerning details of the robbery differs somewhat from Jackson's, the general recollection of events appears consistent. Epting testified that she saw a person later identified as Simmons walk up to the vehicle and that Jackson went to the back of the SUV to show the merchandise. Next, Epting heard the children screaming. She turned to look toward the back of the vehicle and saw Willis walk up wearing a red mask and brandishing a firearm. When Willis got to the SUV, he told the children to get out and get on the ground. The defendant walked Jackson to the front of the SUV and pointed the gun at him. Willis noticed Epting was still in the front passenger seat and ordered her out of the vehicle. She could not get out of the SUV, because the door had to be opened

> from the outside, and that was when the defendant pointed the gun at Epting's child and said he would blow the child's brains out if she did not get out of the truck. Epting testified that Willis then opened the door and that several children were pushed to the ground by other perpetrators. Epting further testified that her son and niece were still in the SUV as Willis began to drive off; however, she was able to grab them before he got away.
>
> Jacques Simmons, the person who posed as a customer, was charged with armed robbery and conspiracy to commit armed robbery. Simmons agreed to testify for the state. Simmons acknowledged that he was likely to be offered a lesser robbery charge, Second Degree Robbery, for his truthful testimony in the case.
>
> During an interview with Detective Eric McElroy of the Ouachita Parish Sheriff's Office("OPSO"), Simmons admitted his involvement in the crime committed on March 8, 2009, and implicated Steven Willis as a participant. Simmons testified that Willis was the one who called Jackson. When Willis returned, he told Simmons and two of Simmons' friends, "come on, we're fixing to hit a lick." Willis then ran behind a house and got a ski mask and a gun. Then they began walking through South Park.
>
> Simmons testified that he approached the victim, who asked him if he was the caller who wanted to buy some shoes. He told Jackson "no, but I'll look at them." He testified that after talking with Jackson, Willis came around and pulled the gun, at which point Simmons ran off.
>
> The state called several other witnesses over the course of the two-day trial, including Detective McElroy and OPSO deputy John "Brad" Duchesne; also, testimony was elicited from four juveniles who pled guilty in the juvenile system to conspiracy charges in connection with this incident. Near the close of the state's case, outside the presence of the jury, defense counsel reported to the court that a plea offer had been made to the defendant. However, prior to the state resting its case, Willis chose not to avail himself of the offer and it was thereby immediately withdrawn by the state.
>
> The defense did not call any witnesses, and all 12 members of the jury found Willis guilty as charged on two counts of armed robbery.

*State v. Willis*, 56 So. 3d 362, 363-65 (La. App. 2 Cir. 2010).

On April 22, 2009, the State, by bill of information, charged Petitioner with two counts of armed robbery. [doc. # 15-1, p. 25]. On January 14, 2010, as mentioned, a jury found Petitioner guilty on both counts. [doc. # 15-2, p. 45-58]. On April 8, 2010, the trial judge sentenced

Petitioner to two concurrent forty-two-year sentences at hard labor without benefit of probation, parole, or suspension of sentence. [doc. # 15-3, p. 1-2]. The judge also sentenced Petitioner to two concurrent five-year sentences at hard labor without benefit of probation, parole, or suspension of sentence. *Id.* The judge ordered the two additional five-year sentences to be served consecutive to the two forty-two-year sentences. *Id.* at 2.

On August 9, 2010, Petitioner, represented by counsel, appealed to the Second Circuit Court of Appeal and raised a single claim: excessive sentences. [doc. # 16-3, p. 2]. On August 16, 2010, Petitioner filed a *pro se* brief and raised the following assignments of error: (1) the trial judge committed error in using the Louisiana enhancement statute because the statute was not set forth in the bills of information; and (2) the trial judge erred in using the elements of the charged offense as aggravating factors in sentencing. *Id.* at 35. The Second Circuit affirmed Petitioner's armed robbery convictions on December 15, 2010. *Id.* at 41. However, the court found merit in Petitioner's *pro se* argument concerning sentence enhancement and vacated the two five-year sentences. [doc. # 16-4, p. 7-8]. The Louisiana Supreme Court denied Petitioner's application for writs on June 17, 2011. *Id.* at 19. Petitioner did not seek further direct review before the United States Supreme Court.

On June 29, 2012, Petitioner filed a *pro se* application for post-conviction relief in the trial court and raised the following assignments of error: (1) double jeopardy; (2) misidentification; and (3) erroneous admission of his confessions. *Id.* at 25. The trial court denied Petitioner's application on July 27, 2012. [doc. # 16-5, p. 10]. Petitioner sought further collateral review before the Second Circuit Court of Appeal on August 22, 2012, claiming that the trial court misinterpreted his assignments of error and that his conviction rested solely on

inconsistent statements made by the victims and his co-defendant. *Id.* at 12. The Second Circuit denied the application on December 20, 2012. *Id.* at 17. The Louisiana Supreme Court likewise denied the application on June 21, 2013. *Id.* at 30.

Petitioner filed the instant Petition on August 27, 2013, requesting relief for the following claims: (1) his armed robbery convictions amount to double jeopardy because the State relied upon the same evidence to convict him on each count; (2) he was subjected to double jeopardy when the trial court punished him twice for the same offense; (3) misidentification; and (4) the trial court erred in admitting two witnesses' testimony. [doc. # 1].

The matter is now before the Court.

## Law and Analysis

### I. Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**II. Petitioner's Claims**

A. Claims One and Two: Double Jeopardy

Petitioner first claims that he was subjected to double jeopardy because the State "relied upon the same set of circumstances and evidence in order to obtain separate convictions for each count of armed robbery . . . ." [doc. # 17, p. 7]. In Claim Two, Petitioner argues that he was improperly "subjected to multiple punishments for offenses that arose out of a single transaction." [doc. # 1, p. 3].

The State charged Petitioner with two violations of LA. REV. STAT. ANN. § 14:64, Louisiana's armed robbery statute. [doc. # 15-1, p. 25]. The first count charged Petitioner with the armed robbery of James Jackson. *Id.* The second count charged Petitioner with the armed

robbery of Makeema Epting. *Id.* Louisiana defines armed robbery as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." LA. REV. STAT. ANN. § 14:64.

Petitioner's essential contention here is that the State should not have tried him for two counts of armed robbery because the alleged robber took the same property—or property belonging to both victims jointly—from the victims at the same time. [doc. # 17, p. 8]. In Petitioner's words: "the facts in this case clearly prove that both victims had control of the same set of items which were taken at the same time . . . . The State's use of evidence showing the items taken from both victims by the robbers only validates one count of armed robbery because the victims were in joint control of [the items]." *Id.*

The state *habeas* court addressed Petitioner's claim and ruled as follows:

> Defendant believes that the charges against him constitute a violation of double jeopardy. He indicates that because both charges filed against him were counts of armed robbery and arose from the same course of events, he cannot be charged for violating the statute twice. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. The victim of Count 1 was James Jackson, and the victim of Count 2 was Makeema Epting. The elements of the two armed robbery charges are the same, with the exception of the victim. Committing the same crime against multiple individuals certainly does not limit a defendant's exposure to multiple counts of violating one particular statute.

[doc. # 16-5, p. 10].

The Double Jeopardy Clause in the Fifth Amendment states that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend. V. The Clause "protects against a second prosecution for the same offense after

acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Austin v. Cain*, 660 F.3d 880, 887 (5th Cir. 2011).

Here, Plaintiff's claims fall within the purview of the third form of double jeopardy protection: protection against multiple punishments for the same offense. More precisely, Petitioner's double jeopardy arguments raise the issue of multiplicity, which "is the charging of a single offense in more than one count." *U.S. v. Swaim*, 757 F.2d 1530, 1536 (5th Cir. 1985). "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *U.S. v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998).

Petitioner's claims do not present the more frequently arising issue of whether two different statutes may punish the same conduct, but instead present the less frequently recurring issue of whether multiple punishments may be imposed for more than one violation of a single statute. *See, e.g., Bell v. U.S.*, 349 U.S. 81, 81-84 (1955). This latter issue requires determination of the "allowable unit of prosecution," *U.S. v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221 (1952), an inquiry that turns on the statutory text and the intent of the legislature, *see Sanabria v. U.S.*, 437 U.S. 54, 69-70 (1978). The "sole question is whether Congress intended to provide for multiple punishments." *U.S. v. Bolin*, 997 F.2d 881 (5th Cir. 1993). The Supreme Court, in *Blockburger v. U.S.*, 284 U.S. 299, 302 (1932), explained: "The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. If the latter, there can be but one penalty." In the

end, "Few, if any, limitations are imposed by the Double Jeopardy Clause on the legislative power to define offenses." *Sanabria*, 437 U.S. at 69.

Here, the specific question presented is whether the two armed robbery charges leveled against Petitioner are consonant with the intent of the Louisiana Legislature as expressed in the language of LA. REV. STAT. ANN. § 14:64. Specifically, does a single instance of robbing two individuals of jointly-owned property constitute one allowable unit of prosecution or two?

In *State v. Gipson*, 359 So. 2d 87, 91 (La. 1978), the State alleged that a defendant robbed three individuals at a grocery store and charged the defendant with three separate counts of armed robbery. The defendant argued that the State should have charged him with only one count of armed robbery because the robbery arose from one transaction. *Id.* The court rejected the argument and held: "The law intends . . . to protect each person offended . . . and each person offended in such a fashion is the victim of a separate crime. It is not double jeopardy therefore to charge or punish the robber for each person he subjects to this offensive conduct." *Id.*

Thus, the *Gipson* court essentially decided that the Louisiana Legislature, in enacting the armed robbery statute, intended to provide for multiple punishments when a defendant robs multiple individuals in one continuous action. *See also State v. Davis*, 336 So. 2d 805, 808 (La. 1976) (holding that the State properly charged the defendant with three robberies and explaining that "[a] separate act and a separate intent was required for each victim; therefore, there was a separate offense against each person robbed."). In so deciding, the court also made clear that the statute intends to protect **individuals** from the use of force, not property.

Similarly, in *State v. Rubin*, 899 So. 2d 180, 184 (La. App. 3 Cir. 2005), the State alleged that a defendant entered a house, took a chain and a bracelet from one individual, and then took a

cellular telephone and a home telephone. The victims included a husband and wife, the owners of the residence, and the couple's friend. *Id.* at 182. The defendant argued that the State improperly charged him with three counts of armed robbery because he did not take anything from the wife or friend. *Id.* The court rejected defendant's argument and held that, when the defendant took some property from the house, he effectively took property from the wife because she shared the residence and "had an ownership interest in, or constructive control of, at least some of the items taken." *Id.* (citing *State v. Long*, 830 So. 2d 552, 557 (La. App. 2 Cir. 2002) (money stolen from a bar was in the immediate control of the victim, a bar employee, for purposes of the robbery statute)). The court also held that, even though the defendant did not actually take anything from the friend, the defendant effectively took property from him because the items he took from the residence were within the friend's immediate control. *Id.*

To support its conclusion, the *Rubin* court cited the Louisiana Supreme Court's explanation of the Louisiana Legislature's rationale in enacting the robbery statute:

> By providing a more severe grade of theft for those instances in which a thief uses force or intimidation to accomplish his goals, the legislature apparently sought to emphasize the increased risk of danger to human life posed when a theft is carried out in face of the victim's opposition. Because the possibility of such a violent confrontation may exist in situations other than those where property is taken directly from the person of another, it has been recognized that it is sufficient for robbery that the property taken be sufficiently under the victim's control, such that, had the victim not been subjected to violence or intimidation by the robber, he could have prevented the taking. *State v. Refuge*, 300 So.2d 489 (La.1974); *State v. Verret*, 174 La. 1059, 142 So. 688 (1932); LaFave & Scott, Criminal law (Hornbook ed.1972), § 94, p. 696.

*Id.* The court ultimately concluded that "the legal identification or robbery victims is based less upon the possessory interest of such victims, and more upon the physical danger or threat such individuals face due to robbery." *Id.* (citing *State v. Sanford*, 446 So. 2d 1381, 1384 (La. App 1

Cir. 1984) ("It is not essential to the crime of armed robbery that [the things of value] were owned by the victim; it is only essential that [the defendant] was not the owner and that the companion [of the victim] had a greater right to possession of the [things of value] at the time of the taking than did [the defendant].")).

Consequently, LA. REV. STAT. ANN. § 14:64, as construed by the Louisiana courts, provides for multiple punishments when a defendant, in one continuous action, takes the same property—or jointly held property—from multiple victims. In that regard, this Court declines to reexamine those state court decisions because construction of state statutes is conclusively a matter of state law of which state courts are the final arbiters. *See New York v. Ferber*, 458 U.S. 747, 767 (1982) ("[T]he construction that a state court gives a state statute is not a matter subject to our review."). Thus, with the aforementioned Louisiana jurisprudence in mind, this Court cannot say that the state *habeas* court's denial of relief on this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. This claim is without merit and should be **DENIED**.[1]

B. Claim Three: Misidentification

Petitioner next claims that he was wrongfully identified and explains that the only evidence pointing to him as the perpetrator was inconsistent witness testimony. [doc. # 1, p. 3]. The state *habeas* court construed and disposed of Petitioner's claim as follows:

> Defendant alleges that his conviction was based on the identification of State's witnesses who made numerous inconsistent statements. Defendant seems to argue

[1] To the extent that Petitioner invokes Louisiana's "same evidence" test, [doc. # 17, p. 10], to prove double jeopardy, the Court observes that the Supreme Court has "disclaimed any intention of adopting a 'same evidence' test" in double jeopardy cases. *U.S. v. Felix*, 503 U.S. 378, 379 (1992) (citing *Grady v. Corbin*, 495 U.S. 508, 520 n.12 (1990)).

> that the victims were not sure of his identity and made inconsistent statements regarding Defendant's identity; however, he fails to mention that he was identified to police and to the jury by his co-defendant, Jacques Simmons. Certainly, the jury is given the responsibility of determining the weight and credibility of the evidence, which includes the testimony heard at the trial of the matter.

[doc. # 16-5, p. 10].

Here, the Court observes that all of Petitioner's current arguments concerning the conflicting testimony were pointed out to the jury in defense counsel's closing argument. [doc. # 16-2, p. 23-30]. It is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Accordingly, a reviewing court should 'not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Nealy v. Dretke*, 182 Fed. App'x 324, 328 (5th Cir. 2006) (citing *Herrera v. Collins*, 506 U.S. 390, 402 (1993)).

The state *habeas* court, albeit implicitly, determined, based at least in part on Jacques Simmons's identification, that the jury's decision was rational. After independently reviewing the alleged inconsistent testimony and all of the remaining evidence, this Court cannot say that the state *habeas* court's decision was contrary to any clearly established federal law. This claim does not warrant federal *habeas* relief and should be **DENIED**.[2]

C. <u>Claim Four: Error in Admitting Testimony</u>

---

[2] Petitioner intimates that the state *habeas* court's decision was contrary to *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), which set forth five factors that a court must consider when confronted with a claim that an identification was unduly suggestive. [doc. # 17, p. 13]. However, in this case, there is no credible suggestion that the prosecution utilized any suggestive procedures that led to any of the witnesses' identification of Petitioner as the perpetrator. Thus, *Brathwaite* is inapplicable.

Petitioner claims that the trial court erred when it allowed William Johnson and Jacques Simmons to testify. [doc. # 1, p. 3]. Petitioner argues that the court should not have admitted Mr. Simmons's testimony because the State promised Mr. Simmons leniency in exchange for his testimony. [doc. # 17, p. 14]. Petitioner fails to expound upon his claim with respect to Mr. Johnson.

Under *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963), the prosecution has a duty to disclose evidence favorable to the accused that is material to the accused's guilt or punishment. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting [the] credibility [of that witness] falls within [the] general rule of *Brady*." *U.S. v. Scott*, 48 F.3d 1389, 1395 (5th Cir. 1995) (quoting *Giglio v. U.S.*, 405 U.S. 150, 154 (1972)). Evidence affecting credibility includes "any understanding or agreement as to a future prosecution." *Giglio*, 405 U.S. at 155.

Thus, "In order to establish a *Giglio* claim, a habeas petitioner must show that 1) the state withheld evidence [of a any understanding or agreement relating to a future prosecution]; 2) the evidence was favorable; and, 3) the evidence was material to the defense." *Derden v. Hargett*, 192 F.3d 126 (5th Cir. 1999). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *U.S. v. Bagley*, 473 U.S. 667, 682 (1985). That in mind, impeachment evidence improperly withheld is not "material where the testimony of the witness who might have been impeached was strongly corroborated by additional evidence supporting a guilty verdict." *U.S. v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989).

Here, the Court cannot find a *Giglio* violation because Petitioner does not show that the State failed to disclose any leniency agreement between it and the two witnesses. *U.S. v. Martinez-Perez*, 941 F.2d 295, 301 (5th Cir. 1991) ( "[A] *Giglio* violation does not occur when the matter was disclosed to the defense before the end of the trial."). As to witness Simmons, the record clearly shows that the State disclosed evidence of any understanding or agreement between itself and Simmons. The following exchange took place prior to Simmons's testimony:

> Simmons's counsel: Your Honor, I'm just showing up to indicate to the court that, you know, that we agreed to testify for the State and that my client, met with him some time ago, and--
>
> * * *
>
> Prosecution: Second Degree Robbery that's been offered to [Mr. Simmons]--
>
> Court: Have you conveyed whatever--
>
> Simmons's counsel: There's been no–[Simmons's] prosecution is in a different section, Your Honor, and they have been no specific--
>
> Court: Mr. Racer, [Petitioner's counsel], are you aware of whatever the–there's been no specific offer. Are you aware of a general offer that's been made [to Simmons]?
>
> Simmons's counsel: What we're hoping–what we've been discussing with Ms. Eade [the prosecutor in Simmons's case] is a Second Degree Robbery with a PSI.
>
> Petitioner's counsel: That was my understanding.
>
> * * *
>
> Court: Simmons is in the courtroom who is a–also has been charged in this incident, his attorney Mr. Val Salomon, is here. Uh, Mr. Salomon, I asked that you be here today, sir, before we took any testimony before we brought the jury in that we could state for the record what your understanding is of any–of a plea offer that's going to go on so that you can advise for the record your client's rights and that you have authorized him or that you've at least rendered an advice to him that he should testify today.

> Simmons's counsel: Yes sir. We're assigned to a different division of the court as I've indicated in the pre-trial conference. The prosecutor in that matter is Ms. Eade. We had discussion with her and subsequently with Mr. Fontenot regarding my client's testifying in this matter. He had given a statement previously, and in light of that it's been agreed that he – the likelihood is that he will be offered a lesser robbery charge, a second degree robbery charge, for his cooperation and he's aware of that. He and I have discussed it and he authorized to testify and will testify truthfully today.
>
> * * *
>
> Court: Were you aware of that Mr. Racer?
>
> Petitioner's counsel: No. Not until just now. I was aware from this letter that there is an anticipated plea.
>
> * * *
>
> Court: Are you satisfied with your knowledge now--
>
> Petitioner's counsel: Yes.
>
> Court: –in terms of what information you have to go forward with this testimony?
>
> Petitioner's counsel: No problem, Your Honor.

[doc. # 15-11, p. 47-54].

In addition, Simmons admitted in open court that the State promised him leniency in exchange for his testimony:

> Prosecutor: Right now you indicate that you have charges of Armed Robbery and Conspiracy to Commit Armed Robbery. Is that correct?
>
> Simmons: Yes, sir.
>
> Prosecutor: And is it your understanding that the State is willing to give you some leniency for your participation in the testimony in this case?
>
> Simmons: Yes, sir.
>
> * * *

Prosecutor: Okay. In talking about leniency have you been – are you aware of any discussions about what kind of charge that you may be permitted to plead to?

Simmons: Well, my lawyer told me what they – it supposed can be dropped to.

Prosecutor: Yes, sir.

Simmons: Yes, sir.

Prosecutor: Second Degree Robbery?

Simmons: Yes, sir.

Prosecutor: And do you know–is that in exchange for truthful testimony?

Simmons. Yes, sir.

Prosecutor: And do you understand that if you do not tell the truth up here that that leniency will not be given?

Simmons: Yes, sir.

Prosecutor: And do you understand that the penalty for Second Degree Robbery would expose you from penalty of three years up to forty years?

Simmons: Yes, sir.

Prosecutor: And you have no idea at this time if – even if you cooperate and testify truthfully what kind of sentence you would receive?

Simmons. No, sir.

Prosecutor: And there's no agreement whatsoever on a sentence. Is that correct?

Simmons: Yes, sir.

Prosecutor: In fact the sentencing that would be for you if this plea goes through would be decided by the Judge and not through agreement between the attorneys. Is that correct?

Simmons: Yes, sir.

[doc. # 16, p. 14-15]. In fact, Petitioner even acknowledges that the State disclosed the proposed plea deal with Simmons. [doc. # 17, p. 14]. Thus, there was no *Giglio* violation because the State disclosed the proposed leniency deal to the defense prior to the end of the trial.

As to witness Johnson, Petitioner fails to argue or even speculate that the State promised Johnson a future plea deal, promised a reduced sentence, or contemplated offering any other type of leniency in exchange for his testimony.[3] *See Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (denying a petitioner's claim that the government suppressed information about a promise to dismiss a misdemeanor charge against a witness in exchange for the witness's testimony and reasoning that, because the petitioner offered no concrete evidence to support his claim, the claim rested upon insufficient speculation). Petitioner's unsupported and wholly conclusory claim does not warrant federal *habeas* relief. *See Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987) (holding that a *habeas* petitioner has the burden of proving facts in support of his or her claim, and unsupported conclusory allegations do not warrant *habeas* relief).

Petitioner has failed to demonstrate that the state *habeas* court's denial of his claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, his claim is without merit and should be **DENIED**.[4]

## Conclusion

[3] The record demonstrates that, prior to Petitioner's trial, the State charged and convicted Johnson with conspiracy for his role in the robbery. [doc. # 16, p. 39].

[4] The state *habeas* court construed Petitioner's claim differently than this Court does in that it did not address Petitioner's allegations with respect to Simmons or Johnson. [doc. # 16-5, p. 10]. Nevertheless, for the above-mentioned reasons, this Court finds no constitutional error in the state court's overall conclusion.

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Steven D. Willis, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum**

**setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 2nd day of June, 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE